UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

RODNEY WILLIAMSON,

        Plaintiff,

v.

JEFFREY WOODS et al.,

        Defendants.

_____/

Case No. 2:18-cv-141

Honorable Gordon J. Quist

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Woods, Horton, Isard, Thompson, and Peterson.

## Discussion

    I.    Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Central Michigan Correctional Facility (STF) in St. Louis, Michigan. The events

about which he complains, however, occurred at the Chippewa Correctional Facility (URF) in Kincheloe, Michigan. Plaintiff sues the following MDOC employees at URF: Warden Jeffrey Woods, Deputy Warden Connie Horton, Assistant Deputy Warden D. Isard, Resident Unit Manager (RUM) S. Thompson, Assistant Resident Unit Supervisor (ARUS) R. Freytag, Prisoner Counselor (PC) Danny Line, Corrections Officer (unknown) Webb, and Transfer Coordinator (unknown) Peterson.

### A. Discrimination

Plaintiff's first set of allegations involves racial discrimination at URF. Plaintiff alleges that in June 2015 he sent a written complaint to Deputy Warden Horton, claiming that he was being discriminated against on account of his African-American background because he was denied the opportunity to watch television shows "dealing with Black entertainment." (Compl., ECF No. 1, PageID.8.) Horton did not respond to the complaint. Plaintiff subsequently filed a grievance against Horton alleging racial discrimination and failure to ensure that prison staff receive appropriate training.

In response to the grievance, ARUS Freytag interviewed Plaintiff. During the interview, Freytag told Plaintiff that

> [T]here will be no 'Black Entertainment' (BET) programs watched in any of these [housing units] because y'all act like 'monkeys when that channel is on, and that's why I don't allow the prisoner(s) in my [housing units] to watch (BET), but most importantly, prisoners here have never been allowed to watch (BET).
>
> [T]he unit officers[] will decide what's being watched in the T.V. room, that's the way it's been running and you're not going to change that Mr. Williamson simply because you and the other Black prisoner(s) want to take over the T.V. room.

(*Id.*, PageID.8-9.)

The following month, Plaintiff became a block representative on the Warden's Forum for his housing unit. He was responsible for assisting prison staff with identifying problems

2

in the unit. On August 4, he asked Officer Webb to change the television to channel 53. Webb responded, "No (BET) is being watched in this unit per PC Line, so you just have to watch some other channel." (*Id.*, PageID.9.) Plaintiff told Webb that Plaintiff had spoken with RUM Thompson about African-American prisoners being denied the opportunity to watch BET programs, and Thompson indicated that prisoners could watch whatever they wanted. Webb became upset and stated,

> [Y]ou're not going to come to this unit and change anything; we were not having any problems with this T.V. until you moved in this [housing unit] and just because the 'Confederate Flag' is coming down in South Carolina doesn't mean things are going to change around here.

(*Id.*)

Two days later, Plaintiff spoke with PC Line about Webb's comments. Line responded,

> [T]he unit officer(s) will run this unit they way they see fit Mr. Williamson and that includes T.V. programming, so I don't want to hear anything else about Black prisoner[s] not being able to watch (BET). If they want to watch (BET) then they should buy a T.V. and I'll speak with Ms. Webb.

(*Id.*)

On August 9, Plaintiff sent a complaint to RUM Thompson about "racial bias" toward African-American prisoners in his unit, and "insubordination" by prison staff regarding "fair T.V. programming." (*Id.*, PageID.10.)

Plaintiff contends that the ratio of black to white prisoners at URF is 3 to 1, yet Defendants Woods, Horton, Isard, Thompson, Freytag, and Line allegedly allowed "discrimination" against Plaintiff and other African-American prisoners regarding television programming. (*Id.*) Plaintiff also contends that 95% of the corrections officers at URF are white and lack adequate training in race relations and understanding of cultural differences, resulting in

3

a high percentage of false misconduct reports against African-American prisoners and disparate treatment in assignment of prisoners to better job assignments.

Based on the foregoing allegations, Plaintiff contends that Defendants Woods, Horton, Isard, Thompson, Freytag, Line, and Webb discriminated against Plaintiff and/or denied him his right to equal protection under the Fourteenth Amendment.

### B. Conditions of Confinement

Plaintiff's second set of allegations involves unsanitary conditions of his confinement at URF.  Plaintiff alleges that on August 6, 2015, he informed PC Line that there were only 2 mop heads available for use to clean his housing unit until August 10, 2015.  Plaintiff's unit contained 155 prisoners and 28 cubicles.  Plaintiff told Line that the unit would not be able to have new mop heads until August 10, and that as a result, using the current mop heads exposed prisoners to "hazardous conditions such as bacteria, feces and urine from the bathrooms[.]"  (*Id.*, PageID.11.)  Plaintiff asked Line for new mop heads, but Line responded, "No, because this unit wasn't having these problems until you moved over here and became a porter, so make [do] with what you have until next week; plus I'm quite sure you're used to living in filth."  (*Id.*)  Plaintiff subsequently complained about the issue in a letter to RUM Thompson.[1]

The following day, when Plaintiff was cleaning his cubical, he noticed "feces" on the mop head and on the floor, which came from the mop.  (*Id.*)  He complained about the issue to Defendants Webb, Horton, Isard, Thompson, and Woods.  On August 11, Thompson told Plaintiff that his concerns would be addressed.  Later that day, PC Line confronted Plaintiff, stating,

> [S]o you snitched me out to my supervisor(s) and what's going on in my unit.  I know about you filing (griv's) and lawsuits; I even know about that settlement you

---

[1] In the letter to RUM Thompson, which is attached to the complaint, Plaintiff explained that "PC Line only allows the (HU) porter(s) to exchange mops every Monday and Thursday for the bathrooms and (HU) cleaning." (Letter, ECF No. 1-1, PageID.41.)

4

> received from the (MDOC), but if you file another complaint or (griev) on me, I'll have someone set your ass up and put your ass in "Steamboat"/i.e., the "Hole."

(*Id.*, PageID.12.) Other prisoners were present when Line called Plaintiff a "snitch."

In addition, Plaintiff contends that custodial staff routinely cleaned the unit showers and bathrooms with bleach, but on August 5, 2015, ARUS Freytag decided that bleach would no longer be used for that purpose.

Based on the foregoing allegations, Plaintiff contends that Defendants Thompson, Line, Horton, and Freytag deprived Plaintiff of his Eighth Amendment right not to be subjected to cruel and unusual punishment because they would not provide adequate cleaning supplies.

### C. Prison Transfer

Plaintiff's third set of allegations involves an allegedly retaliatory transfer to another prison. On August 17, 2015, RUM Thompson called Plaintiff to his office and told Plaintiff,

> [A]pparently you don't like it here at this facility considering all these complaints and (griev's) you've been filing. So how about I just transfer your ass to a facility where you can appreciate what we had to offer here. I got your statement regarding this (griev), now get the hell outta my office.

(*Id.*)

Plaintiff was subsequently transferred to Bellamy Creek Correctional Facility (IBC), which he alleges is a "more restrictive" prison facility. (*Id.*, PageID.13.) Plaintiff contends that Defendants Isard, Thompson, Line, and Peterson were responsible for the prison transfer. Plaintiff claims that they retaliated against him in violation of the First Amendment by transferring him to a more restrictive facility in response to Plaintiff's complaints.

### D. Relief

As relief for the foregoing claims, Plaintiff seeks compensatory and punitive damages.

5

II.	Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating

federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A. Equal Protection

The Court finds that Plaintiff states an equal protection claim against Defendants Freytag, Webb, and arguably Line, with regard to the treatment of Plaintiff's requests for specific television programs.

Plaintiff also makes general allegations about discriminatory treatment regarding prison misconducts and job assignments, but he does not make any specific allegations against any of the named defendants. Accordingly, his general allegations about prison misconducts and job assignments do not state a claim.

### B. Eighth Amendment

Plaintiff alleges that Defendants did not provide adequate cleaning supplies. PC Line provided only two mop heads for porters to clean Plaintiff's unit from August 6 to August 10, 2015. Apparently, Defendant Line changes the mop heads twice a week. On one occasion, Plaintiff discovered feces on one of the mop heads. In addition, Defendant Freytag decided that prison staff would no longer use bleach to clean the prison showers and bathrooms.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson*

*v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

Here, Plaintiff alleges only that prison staff would not provide adequate cleaning supplies. Mops are replaced twice a week, and occasionally bacteria and human waste accumulate on them. In addition, the showers and bathrooms are cleaned without bleach. None of Plaintiff's allegations permit a reasonable inference that he was subjected to a serious risk of harm. The Eighth Amendment does not guarantee that prison floors will be free of contamination from human waste and unwanted bacteria. Nor does it require prison staff to use bleach for cleaning common areas. Plaintiff contends that the inadequate supplies subjected him and other prisoners to a risk of exposure to "bacteria, feces and urine" (Compl., PageID.11), but that is a risk that everyone faces when using public facilities. It is not an unreasonable or even unusual one. The typical response to that risk is to wash one's hands regularly and to not eat off the floor. Plaintiff does not indicate why his conditions posed a particularly serious risk to his health or safety. Accordingly, his allegations do not rise to the level of an Eighth Amendment violation.

8

### C. Retaliation

1. Prison transfer

Plaintiff alleges that Defendants transferred him from one prison facility to another in retaliation for his grievances and complaints. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff's allegations do not satisfy the adverse action requirement of a retaliation claim. "Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005). *See, e.g., Smith v. Yarrow*, 78 F. App'x. 529, 543 (6th Cir. 2003) ("transfer from one prison to another prison cannot rise to the level of an adverse action because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights") (internal quotation marks omitted). If, however, a foreseeable consequence of a transfer would be to substantially inhibit a prisoner's ability to access the courts, then such a transfer could be considered an "adverse action" that would deter a person of ordinary firmness from continuing to engage in the protected conduct. *See Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010) (holding that transfer to

9

administrative segregation or another prison's lock-down unit or can be sufficient to constitute adverse action); *Siggers-El*, 412 F.3d at 702 (holding that a transfer was an "adverse action," where the transfer resulted in plaintiff losing a high paying job that paid for his lawyer fees and moved him further from the attorney); *Johnson v. Beardslee*, No. 1:06-CV-374, 2007 WL 2302378, at *5 (W.D. Mich. Aug. 8, 2007). Similarly, the Sixth Circuit has held that a transfer to segregation or to an area of the prison used to house mentally disturbed inmates could be sufficiently adverse. *See Thaddeus-X*, 175 F.3d at 398; *see also Hill*, 630 F.3d at 468.

Here, Plaintiff transferred from one level II facility to another level II facility. Transfers to the general population of another prison are not typically an adverse action. *See Smith*, 78 F. App'x at 543 (6th Cir. 2003) (collecting cases); *see also Hill*, 630 F.3d at 473; *Thaddeus-X*, 175 F.3d at 398. Plaintiff does not allege that he was transferred to a higher security level at IBC or that he suffered foreseeable adverse consequences as a result of the transfer; he alleges only that IBC was somehow "more restrictive." He does not explain what he means by this subjective assessment. His assertion is too vague and conclusory to put his prison transfer outside the typical category of prison transfers that are not adverse actions. Moreover, the Court recognizes that no two prison facilities are exactly alike. If prisoners are generally expected to endure transfers from one facility to another, then not all differences between two facilities would make such a transfer sufficiently adverse to deter a prisoner from engaging in protected conduct. In short, Plaintiff does not allege any circumstances indicating that Defendants subjected him to an adverse action when transferring him to IBC. This is the only claim against Defendant Peterson. Accordingly, Plaintiff fails to state a claim against Defendant Peterson.

2. Threats by Defendant Line

On the other hand, the Court finds that Plaintiff states a retaliation claim against Defendant Line for threatening to transfer Plaintiff to the "hole" in response to Plaintiff's grievances.

### D. Supervisory Liability

Plaintiff's only allegation against Warden Woods is that he failed to adequately supervise other officers, and failed to respond to Plaintiff's complaints about the alleged discrimination by other officials and the inadequate cleaning supplies. Likewise, Plaintiff's only remaining allegations against Defendants Horton, Isard, and Thompson are that they failed to respond to Plaintiff's complaints about the alleged discrimination or failed to properly supervise other officers. These allegations are not sufficient to state a claim. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Plaintiff has failed to allege that Defendants Woods, Horton, Isard, or Thompson engaged in any active unconstitutional behavior. He does not allege that they were personally involved in any decision to deny him television programming on account of his race, or that they engaged in any other unconstitutional conduct. Accordingly, Plaintiff fails to state a claim against them.

### Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff fails to state a claim against Defendants Woods, Horton, Isard, Thompson, and Peterson. Accordingly, they will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). What remains in the complaint is a Fourteenth Amendment equal protection claim against Defendants Webb, Freytag, and Line, as well as a First Amendment retaliation claim against Defendant Line.

An order consistent with this opinion will be entered.

Dated: November 27, 2018            /s/ Gordon J. Quist
                                     GORDON J. QUIST
                                     UNITED STATES DISTRICT JUDGE